# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 01-3860

SOUTHERN ILLINOIS RIVERBOAT CASINO CRUISES, INC.,
D/B/A PLAYERS ISLAND CASINO,

*Plaintiff-Appellant,*

v.

TRIANGLE INSULATION AND SHEET METAL COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 C 4303—**G. Patrick Murphy**, *Chief Judge.*

ARGUED FEBRUARY 20, 2002—DECIDED AUGUST 23, 2002

Before BAUER, RIPPLE, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Southern Illinois Riverboat Casino Cruises, Inc. d/b/a Players Island Casino brought a diversity action against Triangle Insulation & Sheet Metal, alleging that Triangle was negligent and/or breached an express or implied warranty when it recommended and sold Players a certain maritime sealant for the insulation covering the air conditioning ducts on its casino vessel. Players also sought a declaratory judgment that Triangle was liable for the economic damages

allegedly resulting from this negligence and/or breach of warranty. The district court dismissed the negligence claim with prejudice to refiling it in this action, but without prejudice to filing a claim for contribution in another pending civil action. The district court also granted Triangle's motion for summary judgment with respect to Players's breach of warranty claim, and dismissed its declaratory judgment count for failure to state a claim. Players appeals only the district court's summary disposition of its breach of warranty claim, which we affirm.

## I.

Southern Illinois Riverboat Casino Cruises, Inc. d/b/a Players Island Casino ("Players") owns and operates a casino river boat in Metropolis, Illinois. In March 2000, Players installed new exterior air conditioning unit ducts on the outside stern of its motor vessel, Players II, which operates as a gaming casino. On July 20, 2000, Shay Nolan, Players's facilities manager, contacted Gary Holder, a representative of defendant Triangle Insulation & Sheet Metal ("Triangle"), regarding the need to acquire a waterproof sealant or vapor barrier to protect the insulation then covering the air conditioning ducts from the weather and elements. Later that day, Holder went to the casino vessel to examine and measure the ductwork and site where the sealant would be applied.[1] During the course of Holder's visit, Nolan contends that she, along with another Players employee, advised Holder of the casino's proposed use of the sealant. Specifically, they informed Holder that Players intended to apply any seal-

---

[1] At that time, the ductwork was completely encased by the insulation and was therefore not visible to Holder.

ant he recommend "in the open air at the stern of the vessel during casino business hours," while the vessel was occupied by patrons and employees.[2] Players claims that after Holder was informed of the circumstances in which it intended to apply the sealant, he recommended the type of sealant the casino should use and gave advice regarding the proper application of the product.[3] Triangle disputes this assertion, contending that when Holder visited the proposed application site "he provided no instructions regarding the application of the product."

On July 21, 2000, Holder delivered to Players a catalog page from the Childers Products Company ("Childers"), listing five vapor barriers approved for maritime use under applicable Coast Guard regulations. That same day, Holder advised Nolan by telephone that Triangle had two of the listed products in stock available for immediate purchase, one of which was Encacel V. On July 25, 2000, Nolan ordered four five-gallon containers of Encacel V. The containers were not delivered to the casino vessel, but were instead picked up later that day by Players at Triangle's place of business in Paducah, Kentucky. Each of the containers had identical labels which, among other things, warned buyers that the product was a "flammable liquid and vapor," detailed the side effects a per-

---

[2] Players asserts that it wanted a product that would work under these circumstances "to avoid closing the vessel and thereby avoid interruption of business and concomitant loss of revenue."

[3] In Nolan's affidavit, she also claims that Holder "never told us we should not apply the product while patrons or employees were aboard the vessel," or that "the boat needed to be closed before using this product, or that we should evacuate the vessel area before applying the product as intended."

son might suffer if he inhaled or exposed himself to the product, and gave certain emergency first aid instructions. The container labels also included the following instructions: "**FOR INDUSTRIAL USE ONLY BY TRAINED CRAFTSPEOPLE! REFER TO TECHNICAL DATA AND MSDS SHEETS FOR COMPLETE INSTALLATION IN-STRUCTIONS AND PRODUCT INFORMATION.**"

On July 27, 2000, Players, having apparently read these instructions, informed Triangle that at the time its representatives picked up the Encacel V containers they were not given a copy of the Material Safety Data Sheet ("Safety Sheet") for the product. Triangle immediately sent Players, via facsimile, a brief set of instructions regarding the application of Encacel V, as well as a copy of the Safety Sheet provided by Childers. The Safety Sheet extensively elaborated on the warnings, application instructions, and first aid information noted on the Encacel V container labels.

The label on the Encacel V containers also included the following disclaimer of warranties and remedy limitation:

> **IMPORTANT:** Childers warrants that the materials herein contained, when shipped, conform to specifications and are of first class materials and workmanship. This product is sold upon the condition and agreement that there have been no representations or undertakings made by or on behalf of manufacturer and/or seller, and that there are no guarantees or warranties, express or implied in fact or by law, except as contained herein. Manufacturer and/or seller shall not be responsible, obligated or liable for any application or use of or to which the products may be put, either singly or in combination with other products or ingredients. It being expressly understood and

agreed that manufacturer's and/or seller's liability shall in no event exceed the purchase price.

On July 28, 2000, at approximately 9:00 a.m., Players personnel began applying, in the open air, Encacel V to the surface of the insulation covering the air conditioning ductwork at the stern of the casino vessel.[4] Later that afternoon, guests and employees of Players began complaining that they felt ill from the air inside the vessel. At approximately 4:00 p.m., Holder received a telephone call from a representative of Players advising him of the problem, expressing the opinion that Encacel V was the cause, and requesting that he come to the vessel at once to assess the situation. In response, Holder and two other Triangle employees, Lewis Bowles and Kent Buchanan, immediately traveled to the vessel and, upon their arrival, inspected the site where the product had been applied and recommended that the insulation be removed. The Triangle representatives then removed the insulation, placed it in "heavy" vinyl garbage bags, and deposited the bags on a garbage scow behind the casino vessel. According to Triangle, its representatives discovered the following during the process of removing the insulation: (1) that Players applied an excessive amount of Encacel V to the air conditioning ductwork insulation; (2) that "no seal had been applied [by Players] to the joints in the sheet metal ductwork so as to prevent outside air from entering the intake portion of the duct"; and (3) that a "diesel motor located on a work barge just behind the aft portion of the boat . . . was emitting heavy diesel fumes into the aft area of the boat where the

---

[4] Before applying the product, Players purchased and picked up two additional five-gallon containers of Encacel V from Triangle, both of which had the same label as the other four.

air conditioning ductwork was located." Players disputes that its employees applied an excessive amount of Encacel V, and contends the lack of a seal to the joints of the sheet metal ductwork is irrelevant because the air conditioning units do not pull outside air into the vessel but "simply recirculate air inside the boat."

As a result of the foregoing, Players closed the casino vessel for several hours. The casino reopened for business later that day, however, after the local fire marshal and certain governmental agencies performed air quality testing and other inspections to the vessel, determining that it was safe for re-entry. Although no further Encacel V was applied to the insulation of the air conditioning ducts, the casino vessel was, nevertheless, closed again when patrons and employees of Players continued to complain of feeling ill from the air within the boat. The casino vessel was then closed for two to three business days, during which time Players employees, outside vendors, and contractors all worked on cleaning the vessel from the damage allegedly caused by Encacel V fumes. According to Players, the cleanup "involved virtually the entire vessel, including air conditioning coils and fan motors on all of the air handlers on the boat," and cost thousands of dollars.

On December 5, 2000, Players filed a three-count diversity action, pursuant to 28 U.S.C. § 1332, against Triangle in federal district court, alleging negligence, breach of warranty, and requesting a declaratory judgment on the issue of damages. In Count I, Players alleged that Triangle was negligent in failing to warn or advise it of the "dangerous nature of the ENCACEL V product" or the "risks associated with the intended use." In Count II, Players averred that Triangle breached an express or implied warranty of the parties' sales contract by failing to use

reasonable care in selling and recommending Encacel V as the appropriate sealant for the insulation covering the air conditioning ducts on its casino vessel. In Count III, Players sought a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Triangle was liable for all of the damages allegedly resulting from Counts I and II.

On May 3, 2001, Triangle filed a combined motion to dismiss and motion for summary judgment. On September 25, 2001, the district court dismissed the negligence claim without prejudice, allowing Players to refile it as a contribution claim in another pending civil action.[5] The district court then granted Triangle's motion for summary judgment of Players's breach of warranty claim. In doing so, the district court held that Players could not "as a matter of law, establish that [Triangle] breached any warranty, express or implied,"[6] and "[m]oreover, the label disclaims all warranties and limits [Triangle's] liability to the purchase price." Finally, the district court dismissed Players's declaratory judgment count with prejudice for failure to state a claim. Players appeals only the district court's decision granting Triangle summary judgment of its breach of warranty claim.

---

[5] There is a separate civil action pending before the district court involving plaintiffs who claim that they were personally injured as a result of Players's application of Encacel V—*Howard, et al. v. S. Ill. Riverboat Casino Cruises,* S.D. Ill. Case No. 00-4321-GPM.

[6] In reaching this conclusion, the district court noted "[Players] claims that [Triangle] failed to warn it of the danger posed by the ENCACEL V product. Yet both the label and the Material Data Safety Sheet (MSDS) [i.e., Safety Sheet] accompanying the product specifically warn of the dangers associated with the product . . . ."

## II.

We review a district court's decision to grant a motion for summary judgment *de novo*, construing all facts, and drawing all reasonable inferences from those facts, in favor of Players, the non-moving party. *See, e.g., Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

We begin our analysis by noting that both parties agree that Players's breach of warranty claim is governed by Illinois law, specifically that state's version of the Uniform Commercial Code. Because neither party contends that Illinois's choice of law rules require us to apply the substantive law of another state, *see, e.g., ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995), and "there is a reasonable relation between the dispute and the forum whose law has been selected," *see, e.g., Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000), we will apply Illinois law in this case. In doing so, "[i]t is our duty to apply the law that we believe the Supreme Court of Illinois would apply if the case were before that tribunal rather than before this court." *See, e.g., Help At Home, Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001).

On appeal, Players argues that the district court erred in granting Triangle summary judgment of its breach of warranty claim. Players contends that Triangle expressly or impliedly warranted that Encacel V could be applied to the insulation covering the casino vessel's air conditioning ducts "in the open air at the stern of the vessel during

[regular] business hours," while patrons and employees were aboard. Players claims that this contractual warranty was breached when it applied Encacel V under the afore-mentioned circumstances, and the product's fumes seeped into the interior of the vessel, resulting in the casino being closed for two to three business days and necessitating an extensive and costly cleanup of the vessel. Players also maintains that the disclaimer of warranties, remedy limitation, and warnings included on the label of the Encacel V containers do not preclude it from recovering any consequential damages arising from Triangle's alleged breach of warranty.

For the reasons that follow, we conclude that Players cannot prevail on its breach of warranty claim. In reaching this determination, we have made the following assumptions: (1) that Players submitted evidence sufficient to establish the breach of an express warranty, *see* 810 ILCS § 5/2-313,[7] or the implied warranty of fitness for a particular purpose. *See* 810 ILCS § 5/2-315;[8] (2) that the disclaimer of warranties on the Encacel V container label

_____

[7] Section 5/2-313 provides that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 810 ILCS § 5/2-313.

[8] The implied warranty of fitness for a particular purpose is created "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." 810 ILCS § 5/2-315.

is not included within the scope of the parties' sales contract; and (3) that a genuine issue of material fact remains as to whether the warnings on the Encacel V container label and corresponding Safety Sheet were sufficient to adequately warn Players of the hazards allegedly giving rise to its economic damages.[9] However, even with these favorable assumptions in tow, Players is still precluded from suing Triangle for any consequential damages arising from the alleged breach of warranty because the parties' sales contract contains a valid remedy limitation.

As previously noted, each container label of Encacel V included the following language:

> Manufacturer and/or seller shall not be responsible, obligated or liable for any application or use of or to which the products may be put, either singly or in combination with other products or ingredients. It being expressly understood and agreed that manufacturer's and/or seller's liability shall in no event exceed the purchase price.

Players contends that the remedy limitation is not included in the parties' sales contract because it was an "additional term" under 810 ILCS § 5/2-207 (i.e., the "battle of the forms" section) that "materially altered" the agreement. Section 5/2-207 provides that a:

> [D]efinite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly

---

[9] These assumptions have been made solely for purposes of this case and should not be construed as expressing an opinion on the merits of the underlying issues.

made conditional on assent to the additional or differ-
ent terms.

§ 5/2-207(1).

Between merchants such additional terms become part
of an Article 2 sales contract unless:[10] "(a) the offer ex-
pressly limits acceptance to the terms of the offer; (b)
*they materially alter it*; or (c) notification of objection to
them has already been given or is given within a reason-
able time after notice of them is received." § 5/2-207(2)(a)-
(c) (emphasis added). But neither the text of § 5/2-207,
nor that of any other Illinois U.C.C. provision, explains
when an additional or different term will constitute a
material alteration of a sales contract. We, therefore, turn
to the statute's corresponding comments for interpre-
tive guidance. *See, e.g., Milledgeville Cmty. Credit Union
v. Corn*, 716 N.E.2d 864, 868 (Ill. App. Ct. 1999) (holding
that Illinois courts "examine the pertinent 'Uniform Com-
mercial Code Comment' . . . in order to discern the leg-
islature's intent."). Comment 4 to § 5/2-207 provides that
an additional or different term materially alters a con-
tract when it "result[s] in surprise or hardship if incorpo-
rated without express awareness by the other party . . . ."
§ 5/2-207, U.C.C. cmt. 4. *See also Clifford-Jacobs Forging Co.
v. Capital Eng'g & Mfg. Co.*, 437 N.E.2d 22, 25 (Ill. App.
Ct. 1982).

Players argues that the remedy limitation on the Encacel
V container label is a *per se* material alteration of the par-
ties' sales contract because any limitation on the right
to recover consequential damages causes a significant

---

[10] The district court concluded that the parties are "merchants"
within the meaning of 810 ILCS § 5/2-104. This finding is not
disputed on appeal.

and substantial shift in the ordinary allocation of risk. In support of this argument, Players relies heavily on the case of *Album Graphics, Inc. v. Beatrice Foods Co.*, 408 N.E.2d 1041 (Ill. App. Ct. 1st Dist., 4th Div. 1980). In *Album Graphics*, a cosmetics company sued a glue manufacturer for breach of warranty when a weak adhesive that it purchased from the manufacturer caused its packages to come undone. *Id.* at 1043. The glue manufacturer defended the suit by contending that the warranty disclaimers and remedy limitations included on the glue container labels, as well as the shipping invoices, limited the cosmetic company's damages to the purchase price of the glue. *Id.* at 1044. The *Album Graphics* court held, after assuming the parties formed their contract prior to delivery of the product, that under § 5/2-207, "[a] term disclaiming warranties, *and we might add a term limiting remedies, is undoubtedly a term that materially alters a contract* . . . [and] [t]hus . . . we necessarily conclude that . . . *the limitation of remedies language could [not] become part of the contract under section 2-207(2)*." *Id.* at 1048 (emphasis added).

The holding of *Album Graphics* was, however, recently called into question by a different division of the same Illinois district appellate court in *Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc.*, 733 N.E.2d 718 (Ill. App. Ct. 1st Dist., 3d. Div. 2000). In *Intrastate Piping*, a pipe installation company sued a pipe manufacturer and "middleman" distributor for the cost of removing and replacing allegedly defective pipe. *Id.* at 720. As in *Album Graphics*, the *Intrastate Piping* parties disputed whether a disclaimer of warranties and remedy limitation were included in their sales contract by arguing over the time the agreement was made. *Id.* at 722-23. The *Intrastate Piping* court held that regardless of the time of contract formation, "the remedy limitation—became part of the contracts by

operation of statute" because the buyer failed to season-
ably object to it. *Id.* at 723. In reaching this conclusion, the
*Intrastate Piping* court rejected the *Album Graphics* court's
determination that a remedy limitation is a *per se* material
alteration of a sales contract, noting that in *Album Graphics*
the court "ignored" Comment 5 to § 5/2-207, *id.*, which
provides, in pertinent part, that "[e]xamples of clauses
which involve no element of unreasonable surprise and
which therefore are to be incorporated in the contract unless
notice of objection is seasonably given are . . . a clause . . .
otherwise limiting remedy in a reasonable manner (see
Sections 2-718 and 2-719)." § 5/2-207, U.C.C. cmt. 5.
Not surprisingly, Triangle argues that *Intrastate Piping*
controls our decision in this case.

The Supreme Court of Illinois has not yet addressed
the issue before us: whether a remedy limitation may
constitute a material alteration of a sales contract under
§ 5/2-207. In the absence of a decision by the state's high-
est court, "federal courts treat decisions by its intermedi-
ate appellate courts as authoritative, unless . . . a split
among those courts makes such treatment impossible,
or unless there is a compelling reason to doubt that the
courts have got the law right." *See, e.g., Rekhi v. Wild-
wood Indus., Inc.*, 61 F.3d 1313, 1319 (7th Cir. 1995). As we
have already noted, there are only two intermediate ap-
pellate court decisions that have specifically addressed
this issue, *Album Graphics* and *Intrastate Piping*. These
decisions were made by different divisions of the First
District Appellate Court of Illinois, and their holdings
are clearly not consistent.[11] We must, therefore, deter-

---

[11] The First District Appellate Court of Illinois sits in Chicago,
and encompasses all of Cook County. *See* I.L. Const. art. VI, § 2.

(continued...)

mine whether this split of authority makes it impossible for us to give authoritative effect to either decision.

At the outset of our analysis, we note that the *Album Graphics* court and the *Intrastate Piping* court *both* concluded that whether a remedy limitation materially alters a contract under § 5/2-207 is purely a question of law. The *Album Graphics* court held that a remedy limitation is a *per se* material alteration of a contract under the statute. *See Album Graphics*, 408 N.E.2d at 1043. The *Intrastate Piping* court, however, established a *per se* rule *against* treating *any* remedy limitation as a material alteration under § 5/2-207. Having carefully considered the holdings of both cases, we believe there is a compelling reason to doubt the correctness of the *Album Graphics* decision, at least as it pertains to remedy limitations, given the plain meaning of Comment 5 to § 5/2-207. On

---

[11] (...continued)

Unlike the state's other four district appellate courts, the first district is divided into separate divisions (there are currently six). *See* J. Timothy Eaton et al., Illinois Civil Appellate Practice Chapter 1 Reviewing Courts: State and Federal, II.B(2)[1.8] (Ill. Inst. for Continuing Legal Educ. September 1997). Therefore, the first district is the only intermediate appellate court in Illinois that can have an internal split of authority. From what we can gather, a split of authority among the first district's six divisions can only be resolved by the Supreme Court of Illinois. *See, e.g., Schiffner v. Motorola, Inc.*, 697 N.E.2d 868, 871 (Ill. App. Ct. 1st Dist., 6th Div. 1998) (holding that "principles of *stare decisis*" did not require court to follow a decision rendered by a separate division of the first district, a court of "equal" authority, and noting that "a split in authority between the divisions of the first district is not unprecedented and has led to an ultimate resolution by the supreme court.").

the other hand, the plain meaning of Comment 5 does support the *Intrastate Piping* decision. As explained by the court in *In re Chateaugay Corp.*, 162 B.R. 949 (Bankr. S.D.N.Y. 1994), a case relied upon by the *Intrastate Piping* court:

> The literal provisions of the UCC appear to provide a straightforward basis for analyzing the inclusion of a remedy or damage limitation clause in a battle of the forms between merchants. Section 2-207, Official Uniform Comment No. 5 renders such clauses reasonable, *and directs the parties and the court to § 2-719*. Under the latter provision, limitations on remedies, including consequential damages, are reasonable as a *matter of law*, and do not materially alter the parties' agreement, unless the limitation on the remedy, such as to repair or replacement, fails of its essential purpose, or the limitation on consequential damages is unconscionable . . . . *This approach looks to § 2-719 rather than § 2-207 for the result in the case.*

*Id.* at 956 (emphasis added).

Players argues that we should not consider *Intrastate Piping* as authoritative because it "presents a wholly different factual situation."[12] However, we have already noted

---

[12] Players argues that "in *Intrastate Piping*, the limitation of remedy was agreed to by the buyer before any product was shipped," and "unlike the present case . . . the parties in *Intrastate Piping* had a long course of dealing over several years in which limitations of remedies was a part of every contract." We will briefly touch on these assertions. First, the buyer in *Intrastate Piping* did not agree to the remedy limitation before the goods were shipped. Had that been the case there would have been no dispute. The court merely noted that "the remedy

(continued...)

that whether a remedy limitation constitutes a material alteration of a sales contract under § 5/2-207 is purely a question of law. We recognize that other courts "analyze the question of material alteration on a case-by-case basis as purely a factual one," *see, e.g., Chateaugay Corp.*, 162 B.R. at 956, and that this circuit has utilized such an approach in prior U.C.C. cases, *see, e.g., Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1336-37 (7th Cir. 1991). However, to date, no Illinois court has adopted such an approach with respect to remedy limitations. As such, *Intrastate Piping* is the controlling case on the issue before us, and we are required to give the decision preclusive effect because it is a permissible interpretation of § 5/2-207. *See, e.g., Rekhi*, 61 F.3d at 1319

---

[12] (...continued)
limitation was sent the same day [the contract was made] . . . and was received before any pipe was shipped." *Intrastate Piping*, 733 N.E.2d at 723. The *Intrastate Piping* court made this observation to point out that the buyer in its case had an opportunity to seasonably object to the remedy limitations in question, whereas the buyer in *Album Graphics* did not. In any event, as we note *infra*, Players does not allege that it seasonably objected to the remedy limitation, or that it was denied the opportunity to do so. Additionally, while the *Intrastate Piping* court does make reference to the parties' prior course of dealing, it appears that it was mentioned as an aside, and, at best, was as an alternative basis for its holding (i.e., that even in the absence of Comment 5 to § 5/2-207, the remedy limitation would have been part of the parties' sales contract pursuant to 810 ILCS §§ 5/1-205 and 5/1-201(3)). In any event, there is nothing in the *Intrastate Piping* decision to support Players's suggestion that in the *absence* of a prior course of dealing a remedy limitation is precluded from being automatically incorporated into a contract, pursuant to § 5/2-207, *see* U.C.C. cmt. 5, when a buyer fails to seasonably object to the clause.

(holding that federal courts are, in the absence of a decision by the state's highest court, required to treat an intermediate state appellate court decision as authoritative unless it is abundantly clear that the case was wrongly decided). We, therefore, conclude that after *Intrastate Piping* a remedy limitation cannot, as a matter of Illinois law, constitute a material alteration of a sales contract under § 5/2-207.[13]

Furthermore, even were we persuaded that *Album Graphics* and *Intrastate Piping* presented us with two opposing, yet equally plausible interpretations of state law, it is well established that, for reasons of federalism and comity, "we generally choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability." *Home Valu*, 213 F.3d at 963. *See also Birchler v. Gehl Co.*, 88 F.3d 518, 521 (7th Cir. 1996). In sum, we conclude that the remedy limitation was not a material alteration of the parties' sales contract and became part of the agreement by operation of law, i.e., § 5/2-207, when Players failed to seasonably object to it.[14]

---

[13] Like the *Intrastate Piping* court, this circuit has previously recognized that the contract clauses listed in Comment 5 to § 5/2-207 are reasonable as a matter of law under the statute, and therefore cannot constitute a material alteration of a sales contract. *See, e.g., Sethness-Greenleaf, Inc. v. Green River Corp.*, 65 F.3d 64, 66 (7th Cir. 1995); *Comark Merch., Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1203 (7th Cir. 1991); *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709, 712, 714 (7th Cir. 1987).

[14] Because Players has not asserted that the remedy limitation is to be excluded on either of the other grounds listed in § 5/2-

(continued...)

Having concluded that the remedy limitation is part of the parties' sales contract, we will now address the reasonableness of the clause under 810 ILCS § 5/2-719. *See also Intrastate Piping*, 733 N.E.2d at 723. Section 5/2-719(1)(a) provides that a sales contract "may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts." *Id.* If parties to a sales contract expressly agree for a remedy to be the exclusive remedy, it is the sole remedy available to the buyer, *see* § 5/2-719(1)(b), unless it fails of its essential purpose, § 5/2-719(2), or is unconscionable. *See* § 5/2-719(3). *See also Lara v. Hyundai Motor America*, 770 N.E.2d 721, 728 (Ill. App. Ct. 2002); *Intrastate Piping*, 733 N.E.2d at 724.

As previously noted, the remedy limitation in this case confines Players's recovery to the "purchase price" of the Encacel V. This is clearly the type of exclusive remedy contemplated by § 5/2-719(1). *See, e.g., Intrastate Piping*, 733 N.E.2d at 724 (holding that "Illinois courts have recognized and enforced exclusive remedy provisions, even without the word 'exclusive,' when the contract as a whole warrants such a construction."). The only question then is whether this remedy failed of its es-

---

[14] (...continued)
207(2)(a), (c), i.e., conditional offer or seasonable objection, those issues have been waived. S*ee, e.g., Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 578 (7th Cir. 2001) (holding "[w]e will deem an issue waived where the argument on appeal is undeveloped and not supported with pertinent authority."); *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 965 (7th Cir. 1996).

sential purpose or is unconscionable. Players does not, however, challenge the validity of the remedy limitation on either of these grounds, and therefore has waived this issue as well. *See, e.g., Hoffman*, 256 F.3d at 578 (7th Cir. 2001); *Gagan*, 77 F.3d at 965.

Players's final argument is that the district court's decision should be reversed because the court raised the issue of the remedy limitation *sua sponte*, did not permit the parties to substantively brief the issue, and then used the remedy limitation as the primary basis for granting Triangle's motion for summary judgment of its breach of warranty claim. The transcript from the motion hearing confirms that the district court judge raised the remedy limitation issue *sua sponte*.[15] However, the district court's decision to raise this issue, in and of itself, was not erroneous. While district courts must be careful not to create the impression that they are taking an advocacy position on a particular issue, they are not required to ignore contractual provisions or applicable law. Here, the substance of the Encacel V container label is at the very heart of the parties' dispute in this case. The district court judge did not scour the record searching for a reason to dismiss Players's breach of warranty claim—the rem-

---

[15] At the hearing, the district court judge made the following statements, "Now you've got two things. You've got the disclaimer of warranties which may or may not be adequate; that's up in the air. But you also have something that's even more interesting and often overlooked. You have what's called a limitation of remedy. And the limitation of remedy is different than the disclaimer of warranty . . . . [I]t seems to me . . . [that] irrespective of the issue of warranties, you have a limitation of remedy here which is an entirely different thing . . . . You've got a limitation remedy which just kind of gets around all of the issues concerning warranties."

edy limitation is contained in the *same* section as the hotly contested disclaimer of warranties. Given the current state of Illinois law, one could wonder why Triangle's attorney chose not to raise the remedy limitation issue. Whatever the reason, the district court was certainly permitted to do so. *See, e.g., Jones v. Page*, 76 F.3d 831, 850 (7th Cir. 1996) (holding that "while a judge should never engage in advocacy from the bench, he or she has an obligation to raise legal issues that the parties have overlooked or neglected. After all, the judge is on the bench in the first place (we trust) because of superior legal background, expertise, or credentials, and for that reason '[should] not sit as a passive observer who functions solely when called upon by the parties.' ") (citation omitted).

We agree with Players, however, that once the district court raised the remedy limitation issue, it was required to give Players a meaningful opportunity to address the question before granting Triangle's motion for summary judgment on that basis.[16] In the past, we have held that *sua sponte* dismissals, in this case a decision granting

---

[16] Players's counsel objected to the judge raising the issue *sua sponte*, arguing "Judge, they haven't argued that. They haven't raised it. They have not relied on it. It hasn't been briefed. They haven't made that their argument . . . . It's difficult for me to address that because of the fact that they haven't argued it, haven't briefed it, and it's difficult for me to respond to a section of the code that hasn't been raised by anyone except the court until this morning . . . ." The district court judge's only response to this objection was as follows: "Well, I understand, but you haven't either." In dismissing the case, the district court concluded, "[n]otwithstanding any argument Plaintiff has concerning the viability of the disclaimer of warranties, there is no question that the limitation of remedy provision is sufficient and serves to bar the damages that Plaintiff seeks . . . ."

summary judgment on a basis not argued by the parties, are hazardous for three reasons: (1) they often conflict with the traditional adversarial precepts of our system of justice by tending to make the district court seem like a proponent of one side as opposed to a neutral decision-maker; (2) they may prejudice plaintiffs by depriving them of the opportunity to amend their complaint or to argue against dismissal; and (3) they tend to defeat the very purpose they are designed to serve—judicial efficiency. *See, e.g., Ricketts v. Midwest Nat'l Bank*, 874 F.2d 1177, 1184 (7th Cir. 1989). *See also Stewart Title Guar. Co. v. Cadle Co.*, 74 F.3d 835, 836-37 (7th Cir. 1996). Therefore, as a general rule, "a district court lacks the power to grant summary judgment *sua sponte* unless the party against whom summary judgment was entered had (1) proper notice that the district court was considering entering summary judgment, and (2) a fair opportunity to present evidence in opposition to the court's entry of summary judgment." *Simpson v. Merch. Recovery Bureau, Inc.*, 171 F.3d 546, 549 (7th Cir. 1999). *See also Aviles v. Cornell Forge Co.*, 183 F.3d 598, 604 (7th Cir. 1999).

In this case, only the second prong of this test is at issue: Was Players given a fair opportunity to present evidence in opposition to the district court's entry of summary judgment on the basis of the remedy limitation? We think it is clear from the record that such an opportunity was not afforded to Players. Nevertheless, we see no reason to remand the case because Players was given a full opportunity to make its argument on appeal, and, as indicated in this opinion, the argument presented does not allow it to prevail under Illinois law. If Players had demonstrated that the remedy limitation was excluded from the contract because of a conditional offer or a seasonable objection, or if it had shown that the clause failed of its essential purpose or was unconscionable, there might have

been a basis for remanding the case for further consideration.[17] But in the absence of such assertions, we conclude that the remedy limitation entitled Triangle to summary judgment of Players's breach of warranty claim. *See, e.g., Aviles*, 183 F.3d at 605 n.2 (declining to remand a "premature" *sua sponte* dismissal "for consideration of a fully briefed summary judgment motion" where the district court's decision was based on "a purely legal issue," subject to *de novo* review, and "the interests of judicial economy" dictated that the court address the issue on appeal). *See also Heder v. City of Two Rivers*, 2002 WL 1467425, 295 F.3d 777, 783 (7th Cir. 2002) (holding that the defendant was not entitled to remand where "district court's original calculations and legal theories did not correspond directly to the parties' arguments" because "[the defendant] has made *to us* whatever arguments are available to it, and as appellate review on summary judgment is plenary it does not matter whether the district court's research was based on independent research."). As such, we affirm the district court's decision for the reasons outlined in this opinion. *See, e.g., Peele*, 288 F.3d at 332 (holding that we may " 'affirm the district court's [decision] on any ground supported by the Record . . . .' ") (citation omitted).

---

[17] We note in passing that it is unclear from the record whether Players ever requested that Triangle reimburse it for the purchase price of the Encacel V. Players does not raise the issue on appeal, however, and we will therefore not remand on that basis either.

### III.

The remedy limitation in the parties' sales contract precludes Players from recovering any consequential damages arising from Triangle's alleged breach of warranty. We, therefore, AFFIRM the district court's grant of summary judgment on that basis.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*