In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 01-3685 & 01-3787

TRANZACT TECHNOLOGIES, LTD.,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

EVERGREEN PARTNERS, LTD. and
KELLOGG ASSOCIATES, INC.,

*Defendants-Appellants, Cross-Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 3215—**James F. Holderman**, *Judge.*

———————

ARGUED SEPTEMBER 19, 2003—DECIDED APRIL 28, 2004

———————

Before BAUER, RIPPLE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Kellogg Associates and Evergreen Partners ("the advisors") were hired by Tranzact Technologies, Ltd. to perform advisory services for Tranzact. When Tranzact sold some of its assets to another company, the advisors sought payment of an investment banking fee. Tranzact determined that payment was not required, and sought a declaratory judgment in federal court. It also sued the advisors for breach of contract on the

ground that the advisors had failed to perform all services required under the agreement. The advisors countersued for breach of contract based on Tranzact's refusal to pay the fee. The district court granted summary judgment to Tranzact on the advisors' claim and also granted summary judgment *sua sponte* to the advisors on Tranzact's breach of contract claim. Because the agreement between Tranzact and the advisors reveals that the advisors are not entitled to a fee based upon a sale of assets, and because Tranzact has not persuaded us that it has a valid breach of contract claim, we affirm.

## I.  BACKGROUND

In 1996, Tranzact Technologies, Ltd. engaged Kellogg Associates and Evergreen Partners to perform financial advisory services in connection with a possible sale of or investment in Tranzact. John Lane of Evergreen drafted an agreement, with input from Dan Kellogg of Kellogg Associates and Mike Regan of Tranzact. The agreement was finalized in June 1997. Under its terms, Lane and Kellogg were to receive a $40,000 up-front retainer, and an investment banking fee contingent "upon successful completion of the Transaction." The agreement explained that a transaction could involve either an equity investment or an asset sale. It further stated that if Tranzact entered into a transaction with any party listed on Exhibit A of the agreement, the advisors were entitled to the investment banking fee in the event that the transaction was consummated within one year of termination of the agreement. Tranzact paid the $40,000 retainer, and when the advisors indicated that they would be unable to continue the engagement unless they were paid on an hourly basis, Tranzact paid them over $60,000 in additional fees.

Tranzact terminated the agreement in July 1999. In March 2000, after providing Schneider Logistics (allegedly

without the advisors' knowledge) with a "Selling Memorandum" previously prepared by the advisors, Tranzact sold its Freight Payment Services Division to Schneider for $17,500,000. Because Schneider was listed on Exhibit A and because the Schneider transaction occurred within a year after termination of the agreement, the advisors determined that the investment banking fee provision was triggered despite the fact that the advisors were not directly involved in the transaction. They thus requested payment of the investment banking fee, but Tranzact contended that it was not required to pay and sought a declaratory judgment to that effect in federal district court. Tranzact also sued the advisors for breach of contract, claiming that the advisors had been derelict in their duties under the agreement. The advisors countersued, claiming that Tranzact was in breach due to its failure to pay the fee. The district court granted summary judgment to Tranzact on the advisors' claim. It also dismissed Tranzact's breach of contract claim against the advisors *sua sponte*, ruling that "based on the undisputed evidence in the record[,] the [advisors] satisfied all of [their] contractual obligations. . . ." Both parties appeal.

## II.  ANALYSIS[1]

### A.  The Investment Banking Fee Provision

The relevant portions of the agreement between Tranzact and the advisors are Section 3, entitled "Transaction," and Section 4, entitled "Fees." Section 3 contains the following language:

> A Transaction shall be defined as (1) the sale or other disposition to another corporation, person or

---

[1]  The parties' contract dispute is governed by Illinois law.

business entity (an "investor") of all or a portion of Tranzact's stock or assets, (2) an equity or quasi-equity investment in Tranzact by an investor or (3) a merger, consolidation or other combination of Tranzact with an investor.

Section 4 states in part that:

The Advisors' investment banking fees will be based on the following formula:

0.0% [of the Transaction Value] if the Enterprise Value is below $15,000,000.

0.5% if the Enterprise Value ranges from $15,000,000 to $17,499,999.

1.0% if the Enterprise Value ranges from $17,500,000 to $21,499,999.

2.0% if the Enterprise Value ranges from $21,500,000 to $24,999,999.

2.5% if the Enterprise Value ranges from $25,000,000 to $29,999,999.

3.0% if the Enterprise Value ranges from $30,000,000 to $39,999,999.

4.0% if the Enterprise Value ranges from $40,000,000 to $49,999,999.

5.0% if the Enterprise Value is $50,000,000 or above.

Enterprise Value in this context is the Total Transaction Value divided by the percentage of equity ownership held by an Investor after the Transaction. Total Transaction Value in this context refers to total consideration paid for an equity interest in Tranzact, including any seller financing, plus assumed debt (including bank indebtedness

and shareholders and related party notes, but excluding trade and current payables). The fees will be applied as a percentage of the Transaction Value and will be contingent payable upon successful completion of the Transaction. Payment of these fees will be made at the time of closing of the Transaction.

The district court determined that an enforceable contract existed with respect to another portion of Section 4, which required Tranzact to pay a non-refundable $40,000 retainer "for strategic consulting, due diligence items and the completion of a descriptive memorandum." It found, however, that although Tranzact intended to pay and the advisors intended to receive an investment banking fee upon the completion of a qualifying transaction, the terms of Section 4's fee provision are too indefinite to be enforced. Specifically, the court pointed out that although the term Total Transaction Value is defined, the term Transaction Value is not defined, and found this omission to be fatal because the agreement clearly states that the investment banking fee is to be calculated as "a percentage of the Transaction Value."

The district court further determined that even assuming that Transaction Value has the same meaning as Total Transaction Value, fees are not warranted when a Transaction involves a sale of assets. Rather, the fee provision is triggered when an investor obtains equity interest in Tranzact. It noted that if the fee formula were applied in this case the advisors would not be due any fees, because the number zero must be plugged into the equation whenever the formula requires numbers linked to equity. The court declined to provide an alternative formula and instead granted summary judgment to Tranzact. We review the district court's decision de novo, viewing all facts in the

light most favorable to the advisors.[2] *See Phelan v. City of Chicago*, 347 F.3d 679, 681 (7th Cir. 2003).

"In construing a contract, the primary objective is to determine and give effect to the intentions of the parties at the time they entered into the contract." *Ancraft Prods. Co. v. Universal Oil Prods. Co.*, 427 N.E.2d 585, 588 (Ill. App. Ct. 1981). The advisors assert that here, the parties' intent to provide an investment banking fee in the event of an asset sale is clear, the term Transaction Value has the same meaning as Total Transaction Value, and the fee formula can easily be adapted to address asset sales (although they concede that as currently written, the formula only addresses equity investments). We agree that Transaction Value and Total Transaction Value may be one and the same. Nevertheless, we are not persuaded that the district court erred in finding that no fees are warranted in this instance.

1. Transaction Value

The term Transaction Value is a key component of the fee formula and is thus material to this agreement. *See*

---

[2]  Although the district court acknowledged that it was required to view all facts in the advisors' favor, it also employed the doctrine of *contra proferentem*, which dictates that ambiguous terms in a contract be construed against the drafter. *See Ancraft Prods. Co. v. Universal Oil Prods. Co.*, 427 N.E.2d 585, 588 (Ill. App. Ct. 1981). Although it is not necessarily inappropriate to simultaneously apply a favorable standard of review and *contra proferentem*, *see Phillips v. Lincoln Nat'l Life Ins.*, 978 F.2d 302, 307, 314 (7th Cir. 1993) (applying both), Illinois courts have not applied the doctrine when both parties were involved in the drafting of the agreement, as is the case here (although the advisors were the primary drafters). *See Ancraft*, 427 N.E.2d at 588. We therefore decline to apply *contra proferentem* in this instance.

*Goldstick v. ICM Realty*, 788 F.2d 456, 461 (7th Cir. 1986) (finding price and price formulas essential terms under Illinois law); *cf. Delcon Group, Inc. v. N. Trust Corp.*, 543 N.E.2d 595, 602 (Ill. App. Ct. 1989) (loan amounts and loan formulas are essential terms). If its meaning cannot be determined, the contract is unenforceable. *See Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 601 N.E.2d 956, 960 (Ill. App. Ct. 1992) ("To be enforceable, a contract must show a manifestation of agreement between the parties and be definite and certain in its terms. When material terms and conditions are not ascertainable, there is no enforceable contract, even if the intent to contract is present.") (citations omitted). To avoid this problem, the advisors argue that its meaning is obvious, claiming that just as the term "price" in everyday language means "total price," and the term "value" means "total value," Transaction Value must mean the same as Total Transaction Value.[3]

The advisors' analogies are imperfect. For instance, it is not the case that "price" always means "total price"; consider the sales tax often added to the price of a clothing item, or the many add-ons involved in car purchases and plane tickets despite their seemingly firm prices. Moreover, Transaction Value lends itself to many interpretations based on the agreement's language. Section 4 states that

---

[3] The advisors also contend that a court cannot sever this contract, finding that the provision for the $40,000 retainer is enforceable, but the provision for the investment banking fee is not. We agree. Although Illinois law allows severability under certain circumstances, *see Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343-44 (Ill. App. Ct. 1993) ("The trial court may, in its discretion, modify a contract so that it comports with the law or sever unenforceable provisions from a contract."), this is not one of those cases. *See People ex rel. Foreman v. Vill. of Round Lake Park*, 525 N.E.2d 868, 875 (Ill. App. Ct. 1988) ("Courts which will enforce a contract with a portion severed generally do so when the severed portion does not go to the contract's essence.").

Total Transaction Value "refers to total consideration paid for an equity interest in Tranzact, including any seller financing, plus assumed debt (including bank indebtedness and shareholders and related party notes, but excluding trade and current payables)." Thus, Transaction Value by itself could arguably mean consideration paid for equity interest minus seller financing. Alternatively, Transaction Value might be consideration paid minus assumed debt. Transaction Value might also be the figure one is left with after subtracting both seller financing *and* assumed debt. And of course, Transaction Value could mean exactly what the advisors argue: the same thing as Total Transaction Value, and the omission of the word Total may have been an unfortunate accident.

Thus, despite the advisors' insistence that Transaction Value must mean Total Transaction Value, we find the term ambiguous. However, the advisors argue persuasively that if Transaction Value is ambiguous, the district court should have allowed them to provide extrinsic evidence to support their proposition that Transaction Value means Total Transaction Value rather than finding that the term's ambiguity rendered the contract unenforceable.[4] *See Pritchett v. Asbestos Claims Mgmt. Corp.*, 773 N.E.2d 1277, 1283 (Ill. App. Ct. 2002) ("Extrinsic evidence is admissible to explain the meaning of words in a contract when there is an ambiguity or the words are susceptible of different interpretations."). We therefore assume for purposes of this analysis that had extrinsic evidence been

---

[4] The advisors do not seek a remand based on the district court's refusal to allow extrinsic evidence. *See* Appellants' Reply Brief at 5 ("In any event, Appellants have addressed the [Transaction Value] issue on appeal, and this Court can interpret 'Transaction Value' without remanding.").

provided, it would have revealed that Transaction Value and Total Transaction Value share the same definition.[5]

## 2. The Fee Formula

Merely finding that Transaction Value and Total Transaction Value have the same meaning, however, does not change the outcome of this case. The problem that the fee provision poses for the advisors is that the variables in the fee formula are tied to equity. In this instance, because the Transaction involved an asset sale, zero must be plugged into the equation whenever an equity number is required, and thus no fees are due.[6]

The advisors complain that the above interpretation of the fee provision violates the rule that a court must give effect to all provisions of a contract. Specifically, they argue that if we find no fees to be due, we would eviscerate

---

[5] We note that this is a questionable assumption, as the advisors give no hint as to what type of evidence they would have provided had they been given the opportunity to do so.

[6] This is because the key terms in the fee formula are Transaction Value, Total Transaction Value, and Enterprise Value. We explained earlier that Transaction Value is the same as Total Transaction Value for purposes of this case. Total Transaction Value is defined as "total consideration paid for an equity interest in Tranzact." Here, no consideration was paid for an equity interest because this was an asset sale. Thus, the Transaction Value and Total Transaction Value are zero. As for Enterprise Value, this figure is arrived at by dividing Total Transaction Value by "the percentage of equity ownership held by an Investor after the Transaction." Because this was an asset sale, the investor has no equity ownership, and we have already explained above that the Total Transaction Value is zero. Thus, to determine the Enterprise Value in this case, one must divide zero by zero percent, resulting in an undefined number.

Section 3, which defines Transaction to include asset sales, and Section 4, which says that the investment banking fee will be paid upon "successful completion of the Transaction." Moreover, they posit, while it is true that the fee formula would need to be adapted to address asset sales, such adaptation is within this court's power. They claim that the fee formula can be altered merely by replacing "percentage of equity ownership" with "percentage of company's assets purchased."

The advisors are mistaken. It is true that "Illinois courts . . . apply the principle of construction that a contract must be interpreted as a whole, giving meaning and effect to each provision." *Emergency Medical Care, Inc. v. Marion Memorial Hosp.*, 94 F.3d 1059, 1061 (7th Cir. 1996); *see Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (finding "that a document should be read to give effect to all its provisions and to render them consistent with each other" to be a "cardinal principle of contract construction"). But our analysis does no violence to this rule. The fact that Section 3 broadly defines Transaction does not mean that Section 4 must be interpreted to trigger investment banking fees in all instances. Section 4 clearly states that "[t]he fees will be applied as a percentage of the Transaction Value and will be contingent payable upon successful completion of the Transaction," and a court must interpret a contract based on its plain meaning. *See Ancraft Products Co.*, 427 N.E.2d at 587 ("If the contract terms are unambiguous, then the parties' intent must be determined solely from the language of the contract."). Based on the plain language, fees are provided only as a percentage of Transaction Value. The Transaction Value in this case is zero because the formula calls for data involving equity interest, which is not a factor in asset sales. (Indeed, the formula does not mention asset sales at all.) The conclusion we must draw is that the parties did not intend to pay or

receive fees in the event of an asset sale, but *did* intend to pay and receive such fees in the event of equity investment.

The advisors are not allowed to introduce extrinsic evidence unless the contract's terms are ambiguous, and ambiguity does not arise merely because Tranzact and the advisors cannot agree on the meaning of the fee provision. *See Pritchett*, 773 N.E.2d at 1283; *see also Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1039 (7th Cir. 1998) (deciding that under Illinois law, because the appellees had provided a reasonable interpretation of the contract but the appellants had not, "there [wa]s no ambiguity to construe against the drafter or to clear up by appeal to extrinsic evidence"). Because we find the fee provision to be unambiguous, and that fees are unwarranted in the event of an asset sale, our analysis would ordinarily end here. *See Emergency Medical Care, Inc.*, 94 F.3d at 1061 ("If the language unambiguously answers the question at issue, the inquiry is over.").

For completeness' sake, however, we note that even if the parties intended to provide a fee based on an asset sale and inadvertently left out the proper formula for arriving at such a fee, the district court was not at liberty to rewrite the fee provision, and neither are we. The advisors admit that the parties never discussed with any degree of specificity how fees based on asset sales could be calculated. Although they put forth a purported expert who provided a hypothetical formula, the expert acknowledged that there are numerous ways of computing a fee based on asset sales. The advisors provide no standard to which this court could look for reassurance that an alternative formula would follow industry standards.

Moreover, although the advisors point to *Wisconsin Real Estate Investment Trust v. Weinstein*, 781 F.2d 589, 591 (7th Cir. 1986), for the proposition that this court is authorized to draft a new formula, *Weinstein* is not rele-

vant to this case. In *Weinstein*, we upheld a district court's decision to choose between two accounting periods—specifically, contract years or calender years—when the contract was silent on this point and the parties advocated different periods. We found the district court's choice of contract years to be appropriate in part because "[a]ccounting years frequently follow contractual relations rather than the calendar." *Id.* at 593; *see also Clark v. Gen. Foods Corp.*, 400 N.E.2d 1027, 1030-31 (Ill. App. Ct. 1980) (enforcing the contract despite "the lack of an exact figure as to compensation" because compensation in the industry was "routinely based" upon an agency's fee schedule). Here, however, we know nothing about the propriety of substituting assets for equity in the current formula, and we are not required to guess. *See Goldstick*, 788 F.2d at 461 ("If people want the courts to enforce their contracts they have to take the time to fix the terms with reasonable definiteness so that the courts are not put to an undue burden of figuring out what the parties would have agreed to had they completed their negotiations."); *cf. Bd. of Trs. of the Univ. of Ill. v. Ins. Corp. of Ir., Ltd.*, 969 F.2d 329, 332 (7th Cir. 1992) (following the Restatement (Second) of Contracts, Illinois law allows reformation only when "the intended agreement is certain enough to accurately rewrite the contract").

B. Tranzact's Breach of Contract Claim

Tranzact sought a refund of all monies paid to the advisors for work conducted under the agreement. However, the district court determined *sua sponte* that "all contractual obligations of the parties have been satisfied under the Agreement, and no further monies or actions are due by either side." Tranzact complains that the district court acted improperly by denying Tranzact notice and an opportunity to oppose summary judgment.

We have cautioned district courts to provide parties with notice and a fair opportunity to present evidence when they are considering entering judgment *sua sponte. See, e.g., S. Ill. Riverboat Casino Cruise, Inc. v. Triangle Insulation & Sheet Metal Co.*, 302 F.3d 667, 678 (7th Cir. 2002). Nevertheless, a *sua sponte* judgment may be affirmed if the complaining party cannot show on appeal that it was deprived of the opportunity to present a viable claim. *Id.* ("see[ing] no reason to remand the case because [the plaintiff] was given a full opportunity to make its argument on appeal"); *see also Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139-41 (2d Cir. 2000) (finding no reversible error when the district court granted judgment *sua sponte* despite lack of prior notice); *cf. R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 649-50 (7th Cir. 2003) (reversing *sua sponte* judgment because record did not support district court's conclusions and plaintiff would have introduced additional evidence); *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 606 (7th Cir. 1999) (reversing *sua sponte* judgment because plaintiff "presented enough evidence" to establish a viable claim).

Tranzact has failed to show that it has a viable claim on appeal. In its fact section, Tranzact stated only that "Defendants failed to perform all services required under the Agreement," followed by a string-cite to the record. It also failed to flesh out the merits of the claim in the page and a half that it devoted to this issue in its argument section.[7] We therefore affirm the grant of summary judgment in the advisors' favor.

---

[7] Moreover, our own review of the record casts no doubt on the district court's conclusion that the advisors fulfilled all of their duties as set forth in the agreement.

### III.  CONCLUSION

For the foregoing reasons, the district court's decision is AFFIRMED.


A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*