# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2045
_____

William Murr

*Plaintiff - Appellant*

v.

Midland National Life Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: April 16, 2014
Filed: July 15, 2014

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

This dispute concerns a missing term in an annuity contract sold by Midland National Life Insurance Company (Midland) to William Murr. Murr contends that the plain language of the contract dictates that the term is zero or that, at a minimum,

Midland's proffered term is unreasonable. The district court[1] granted summary judgment in favor of Midland. Murr appeals, and we affirm.

## I. Background

### A. Midland's Legacy Bonus 11 Annuity

Midland markets and sells various types of life insurance policies and annuity products. Relevant to this dispute is one of Midland's fixed deferred annuity products, named the Legacy Bonus 11 Annuity. Generally, an annuity is a contract purchased from an insurance company that enables the annuitant to receive an income stream for the duration of his life. The annuitant makes a lump sum premium payment or series of premium payments in return for regular disbursements from the insurance company that begin either immediately or at some point in the future.

When a new certificate of the Legacy Bonus 11 Annuity is purchased, Midland credits interest on the initial premium on the certificate's issue date at a rate that Midland has declared (the current interest rate). The current interest rate is set forth by Midland in the annuity contract along with the duration for which the rate is guaranteed. Midland then declares new interest rates for future durations.

The Legacy Bonus 11 Annuity contract allows annuitants to add subsequent premiums to their annuity certificates. Midland periodically declares the interest rate for the subsequent premiums added to existing Legacy Bonus 11 Annuity certificates (the current new money rate). The current new money rate cannot be less than the minimum interest rate guaranteed for the life of the annuity.

---

[1] The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa.

Midland uses the same process to determine the current interest rate for the Legacy Bonus 11 Annuity as it does to determine the current new money rate for the Legacy Bonus 11 Annuity. To determine the current interest rate and the current new money rate, Midland follows a process in which it considers several factors, such as market yields, market trends, competitive conditions, costs, and business judgment.

Based on these factors, Midland declares for the Legacy Bonus 11 Annuity a single interest rate that it uses as the current interest rate and the current new money rate. In other words, at any given point in time, the current interest rate is the same as the current new money rate. When Midland discontinued selling certificates of the Legacy Bonus 11 Annuity and consequently was no longer declaring the current interest rate, Midland continued to declare the current new money rate using the same process.

The Legacy Bonus 11 Annuity contract permits annuitants to fully surrender their annuity at any time prior to the annuity's maturity date. When an annuitant elects to surrender his annuity, the surrender value must be calculated to determine the amount payable to the annuitant upon surrender. The surrender value is equal to the accumulation value multiplied by the interest adjustment less the surrender charge and any applicable premium tax. But the surrender value cannot be less than the minimum guaranteed cash value or greater than the accumulation value. Midland assesses a surrender charge if the annuitant makes a full surrender within the contract's fourteen-year surrender period. Anytime an annuitant initiates a full surrender subject to a surrender charge, the contract also requires the calculation of the interest adjustment.

The dispute in this case centers on a term in the interest adjustment formula. The main purpose of the interest adjustment is to facilitate the equitable allocation between Midland and annuitants of the risk associated with early surrenders. The amount of the interest adjustment is determined by comparing the current interest rate

that was offered on the Legacy Bonus 11 Annuity certificate when that certificate was issued with the current interest rate offered on newly issued Legacy Bonus 11 Annuity certificates on the date of surrender. The formula also adjusts for the amount of time remaining in the surrender period. The formula for the interest adjustment is represented mathematically as $[(1 + i_o - .005)/(1 + i_t)]^{\wedge}(T).$ [2] The value of "$i_o$" is the current interest rate offered on the annuity certificate on the certificate's issue date. The value of "$i_t$" is the current interest rate offered on new annuity certificates as of the date of surrendered. If $i_o - .005$ is greater than $i_t$, the formula will generally result in a positive interest adjustment, which will increase the surrender value. Conversely, if $i_o - .005$ is less than $i_t$, the formula will generally result in a negative interest adjustment, which will decrease the surrender value.

## B. The Dispute

Murr purchased the Legacy Bonus 11 Annuity from Midland in 2004. Murr's annuity certificate bore an initial interest rate of 3.4% and had a guaranteed minimum interest rate of 2% for the life of the annuity. In 2009, during the fifth year of his contract, Murr requested a full surrender of his annuity. Two years prior to Murr's surrender, however, Midland had discontinued the Legacy Bonus 11 Annuity. Because Midland was not offering new certificates of the Legacy Bonus 11 Annuity and consequently was not declaring the current interest rate to use for the value of "$i_t$," Midland, in calculating Murr's interest adjustment, used the current new money rate that Midland was offering on the date of Murr's surrender. The current new money rate on the date of Murr's surrender was 3.55%.

Murr filed suit for breach of contract and unjust enrichment. Murr moved for certification on behalf of a class of annuity purchasers who surrendered their

---

[2] The value of T is time in years, including fractional years, remaining in the surrender period. The symbol $\wedge$ means to the Tth power.

annuities after their particular annuities were discontinued. The district court denied the motion, reasoning that "[b]ecause the merits can be resolved so efficiently," Murr's individual claims should be evaluated first, before any class certification ruling. D. Ct. Order of Sept. 20, 2012, at 2.

The parties thereafter filed cross-motions for summary judgment. The district court denied Murr's motion and granted Midland's motion. The district court found that the annuity contract was silent as to the value of "$i_t$" in this case, where Midland had discontinued the annuity. D. Ct. Order of Apr. 11, 2013, at 7. Pursuant to Restatement (Second) of Contracts § 204, the district court looked for a term for the value of "$i_t$" that was reasonable under the circumstances. Id. at 7-8. The district court found that Midland's use of the 3.55% interest rate that it was offering as the current new money rate on the date of Murr's surrender was reasonable and thus supplied that interest rate. Id. at 8.

## II. Discussion

"This court reviews 'de novo a district court's grant of summary judgment, as well as its interpretation of state law and the terms of a contract.'" Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 916 (8th Cir. 2013) (quoting Emp'rs Reinsurance Co. v. Mass. Mut. Life Ins. Co., 654 F.3d 782, 789 (8th Cir. 2011)). "Summary judgment is proper if, viewing the record in the light most favorable to [Murr], there is no genuine issue of material fact and [Midland] is entitled to judgment as a matter of law." Id. (quoting Myers v. Richland County, 429 F.3d 740, 750 (8th Cir. 2005)). Because in a diversity case a contract must be construed according to state law, see St. Louis Produce Mkt. v. Hughes, 735 F.3d 829, 831 (8th Cir. 2013), we construe the contract according to Iowa law.[3]

_____

[3]Murr contends that Iowa law applies. Midland contends that Arizona law should govern, but maintains that we need not engage in a choice-of-law analysis to

-5-

Murr asserts that Midland breached the annuity contract because it used 3.55% for the value of "$i_t$" when Midland was no longer offering new certificates of the Legacy Bonus 11 Annuity. Specifically, Murr argues that the plain language of the annuity contract requires that the value of "$i_t$" be zero when no new certificates are being offered. Murr further contends that Restatement (Second) of Contracts § 204 does not apply. In the event that § 204 does apply, Murr argues that he has provided sufficient evidence to create a material factual dispute as to the reasonableness of 3.55%.

The parties agree that the annuity contract is unambiguous, but they dispute whether the terms of the contract address the issue presented in this case.[4] Accordingly, we must determine whether the annuity contract sets forth the value of "$i_t$" when Midland no longer offers new certificates of the Legacy Bonus 11 Annuity. When a contract is clear, the court is bound to enforce its terms as they are written, as it is improper for a court to "substitute a different meaning for that which the parties clearly intended and embodied in unambiguous terms." Christoffersen v. Yellow Book USA, 536 F.3d 947, 949 (8th Cir. 2008) (quoting Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 711 (8th Cir. 2004)) (applying Iowa

resolve this appeal because under either law, the judgment should be affirmed. The district court applied Iowa law because "[n]either party ha[d] identified a true conflict between the laws of these two states." D. Ct. Order of Apr. 11, 2013, at 6 n.6.

[4]Murr contends that because the contract is unambiguous, we are compelled to enforce the plain language of the contract. Murr's argument is based on the assumption that if a contract is unambiguous then the plain language provides all that is necessary to determine the rights and obligations of the parties. When a term is missing, however, there is nothing to interpret or to find ambiguous. Cf. A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am., 475 N.W.2d 607, 618 (Iowa 1991) (explaining that an ambiguity occurs in a contract when a genuine uncertainty exists concerning which one of two or more reasonable interpretations of a disputed term is proper). The determination that a term is missing thus does not compel the determination that the contract is ambiguous.

law).  In a *casus omissus*,[5] however, where the four corners of the parties' written agreement fail to provide for the dispute at hand, it is up to the court to fill the gap left by the contracting parties.  See Restatement (Second) of Contracts § 204; see also Family Snacks of N.C., Inc. v. Prepared Prods. Co., 295 F.3d 864, 869 (8th Cir. 2002); Taylor Enter., Inc. v. Clarinda Prod. Credit Ass'n, 447 N.W.2d 113, 116 (Iowa 1989) (recognizing § 204's application when a term is not covered by the expressed contract).

Murr argues that the plain language of the contract dictates that the value of "$i_t$" is zero when Midland is no longer offering new certificates.  We disagree.  Completely absent from the annuity contract is any indication about the interest rate to be applied in the event that Midland is no longer offering new certificates of the annuity.  The contract defines "$i_t$" as "[t]he Current Interest Rate (excluding any additional interest) offered for new certificates."  This language does not provide for the value of "$i_t$" when new certificates are not being offered.  If the plain language of the contract dictates that the value of "$i_t$" is zero in these circumstances, as Murr argues, that would mean that a new certificate of the Legacy Bonus 11 Annuity would have had a declared current interest rate of zero at the time of Murr's surrender.  This is not the case, as no new certificates were being issued from which to determine the value of "$i_t$."

Murr relies on Tranzact Technologies, Ltd. v. Evergreen Partners, Ltd., 366 F.3d 542 (7th Cir. 2004), to support his argument.  Tranzact, however, is inapposite.  In that case, the parties entered into a contract for the performance of advisory services.  Id. at 544.  The contract provided that the advisors would be paid fees for their work on certain transactions.  Id. at 544-45.  The amount of those fees was

_____

[5]*Casus omissus* is defined as "[a] situation not provided for by a statute or contract, and therefore governed by caselaw or new judge-made law."  Black's Law Dictionary 210 (7th ed. 1999).

determined by calculating a percentage of the "Total Transaction Value."[6] Id. at 545. "Total Transaction Value" was defined as the "total consideration paid for an equity interest in Tranzact[.]" Id. The advisors brought suit to recover a fee for a transaction involving an asset sale. Id. at 544. Tranzact refused to pay the advisors, arguing that under the plain terms of the fee provision, the advisors were entitled to fees only for transactions that involved equity interest, not asset sales. Id. The Seventh Circuit agreed: "Based on the plain language, fees are provided only as a percentage of Transaction Value. The Transaction Value in this case is zero because the formula calls for data involving equity interest, which is not a factor in asset sales." Id. at 548. The plain language of the contract in Tranzact explained how to determine the amount of the Transaction Value under all circumstances—the consideration paid for equity interest. Id. at 545. The annuity contract here, however, does not set forth how to determine the value of "$i_t$" when Midland is not offering new certificates of the annuity. In Tranzact, the amount of consideration paid for equity interest in the transaction, which was zero, was ascertainable because the transaction did not involve equity interest. In this case, however, the current interest rate for new certificates of the annuity was unavailable because no new certificates existed from which the value of "$i_t$" could be ascertained.

Midland argues that because the annuity contract does not provide a value for "$i_t$" in the circumstances of this case, the court must supply a reasonable term under Restatement (Second) of Contracts § 204. Section 204 provides as follows: "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."

---

[6]The court assumed that "Total Transaction Value" had the same meaning as "Transaction Value" and therefore used the terms interchangeably. Id. at 547.

Murr argues that § 204 does not apply because the annuity contract provided all essential terms and because Midland foresaw the situation that gave rise to this dispute. Murr's argument that § 204 does not apply because the express written contract provides all essential terms is foreclosed by our previous conclusion that the contract is silent regarding the value of "$i_t$" in the absence of new certificates. It is clear that the adjustment interest and in turn the surrender value must be calculated in order to determine the amount to which Murr is entitled under the contract. A value for "$i_t$" is thus essential to the determination of the parties' rights and duties.

Moreover, nothing in the express terms of § 204 supports Murr's assertion that its application is dependent on whether Midland foresaw the need for the missing term. Instead, § 204 states that a court is authorized to supplement a contract whenever the parties have not agreed regarding an essential term. The lack of mutual assent resulting in an omission may be attributable not only to the parties' failure to foresee the situation that gave rise to the dispute, but also to the parties' failure to address their respective expectations:

> The parties to an agreement . . . may have expectations but fail to manifest them, either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse.

Restatement (Second) of Contracts § 204 cmt. b.

Midland and Murr's bargain was sufficiently defined to be a contract, as evidenced by their performance thereunder. Further, there is no doubt that the parties agreed to the calculation of the surrender value and, as part of the surrender value, the interest adjustment. But the parties failed to manifest their expectations with respect to the value of "$i_t$" in the absence of new certificates. This may have been because Midland assumed that it was permitted to use the current new money rate for the

value of "$i_t$" when new certificates are not being offered, as it had always done in the past. Nonetheless, Midland and Murr's bargain is sufficiently defined as a contract, and they failed to agree to the term for the value of "$i_t$" in the absence of new certificates, a term that is required to determine Murr's rights and Midland's duties under the annuity contract. Thus, § 204 permits the court to supply a term for the value of "$i_t$" that is reasonable under the circumstances of this case.

Murr lastly argues that in the event that § 204 applies and allows the court to supply the missing term, he has raised a genuine dispute of material fact as to whether 3.55% is a reasonable term. Comment d of § 204, provides guidance regarding the process of supplying an omitted term:

> The process of supplying an omitted term has sometimes been disguised as a literal or a purposive reading of contract language directed to a situation other than the situation that arises. Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the circumstances. But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.

A court is not interpreting the contract when it supplies a missing term. See Restatement (Second) of Contracts § 204 cmt. c ("[T]he supplying of an omitted term is not within the definition of interpretation[.]"). The same sort of evidence that is relevant to a court's interpretation of a contract, however, can be viewed as relevant to a court's supplying a missing term. As the Supreme Court of Iowa has recognized, the court may use extrinsic evidence to determine what meanings of a term are reasonably possible and to choose among possible meanings, even absent a determination that an ambiguity exists. Pillsbury Co. v. Wells Dairy, Inc., 752

N.W.2d 430, 436 (Iowa 2008). "[T]he meaning of a contract 'can almost never be plain except in a context.'" Id. (quoting Restatement (Second) of Contracts § 212 cmt. b). "Any determination of meaning or ambiguity should only be made in the light of relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." Fausel v. JRJ Enters. Inc., 603 N.W.2d 612, 618 (Iowa 1999) (alteration omitted) (quoting Restatement (Second) of Contracts § 212 cmt. b). The term for the value of "$i_t$" in the absence of new certificates is neither plain nor ordinary, nor is it deducible from the face of the annuity contract. Accordingly, we may refer to extrinsic evidence to supply a reasonable term. See, e.g., Edwards v. Wyatt, 330 F. App'x 342, 349-50 (3d Cir. 2009) (examining course of dealing to supply a missing term); Bank of N.Y. v. Janowick, 470 F.3d 264, 272 (6th Cir. 2006) (applying § 204 and considering evidence of the parties' efforts to allocate and shift risks through contractual mechanisms).

Murr contends that 3.55% is not reasonable, because when new certificates are no longer being offered the factors that Midland uses to set the current new money rate—competitive conditions, costs, and business judgment—are different from what they would have been had Midland continued to offer new certificates. Specifically, Murr contends that the current new money rate when new certificates are no longer being offered is affected by the drop in costs associated with no longer selling new certificates. This causes the declared current new money rate to be higher than it would have been had new certificates still been offered. Moreover, without the sale of new certificates, Midland's incentive is no longer to attract customers to purchase the annuity. Because subsequent premiums make up a small percentage of Midland's business, Murr argues, the competitive landscape in which the current new money rate is set is different. In these circumstances, Midland could use its business judgment to set the current new money rate higher than the rate it would have set had it not exercised its business judgment in order to obtain a gain from a negative

-11-

interest adjustment, because that gain could exceed the amount of any additional interest credited to subsequent premiums.

Murr's evidence supporting his theory consists primarily of the declaration of Terry Long, a consulting actuary. In his declaration, Long stated: "While the procedure may be the same, the interest rate that is determined pursuant to that procedure probably will not be the same because the procedure incorporates the application of business judgment, and when business judgment is applied to differing situations, different judgments will be made." Long further stated that "[m]arket factors, economic factors and the structure and design of the old policies will affect the business judgment used in calculating the [current] new money rate when the particular annuity contract is no longer offered for sale." (internal quotation marks omitted). Long also confirmed that Midland could set the current new money rate higher than the rate it would have set had it not exercised its business judgment to decrease any positive interest adjustment, because the "gain from the Interest Adjustment could exceed the amount of any additional interest credited to new premium payments in [subsequent] years."

In his deposition testimony, however, Long admitted that he did not analyze the current new money rates that Midland had offered to assess whether they were higher or lower than the rate Midland would have set had it not exercised its business judgment; that he did not know whether the 3.55% interest rate was higher than the rate Midland would have set had it not exercised its business judgment; and that, if the current new money rate was higher, he would be unable to determine the reason for the overstatement. In fact, the record reflects that the 3.55% interest rate was below the rate Midland would have set had it not exercised its business judgment.

Once a movant for summary judgment has properly supported its motion, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Conclusory affidavits, even from expert witnesses, do

not provide a basis upon which to deny motions for summary judgment." Jackson v. Anchor Packing Co., 994 F.2d 1295, 1304 (8th Cir. 1993). Long's declaration is insufficient as a matter of law to establish that a genuine issue of material fact exists. Although it states, albeit in a conclusory manner, that the procedure by which Midland calculates the current new money rate may result in a different interest rate when no new certificates are being offered because Midland's business judgment changes when new certificates are being offered, Long's declaration does not demonstrate that Midland's business judgment affected its determination of the 3.55% interest rate in this particular situation. Even if Midland had been offering new certificates, its business judgment, although different from its business judgment when it is not offering new certificates, may have nonetheless led it to set the current interest rate at 3.55%. Similarly, even though Murr pointed to testimony averring that the costs associated with selling new certificates are no longer present when new certificates are not being offered, Murr has not presented evidence that the amount attributable to these costs affected the reasonableness of the 3.55% interest rate. In other words, Murr has not set forth facts to show that 3.55% is an unreasonable term even though using the current new money rate for the value of "$i_t$" when no new certificates are being offered could theoretically be unreasonable in some situations. Murr thus has not raised a genuine issue of material fact concerning the reasonableness of using the 3.55% interest rate for the value of "$i_t$" in this case.

## III. Conclusion

The judgment is affirmed.

_____