IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| F.A.M.E. LLC d/b/a Falk Associates Management Enterprises a/k/a FAME, | § § § | No. 230, 2025 |
| | § | |
| Plaintiff Below, Appellant/Cross-Appellee, | § § | Court Below: Superior Court of the State of Delaware |
| | § | |
| v. | § | C.A. No. N22C-12-003 |
| | § | |
| EMTURN LLC and EVAN TURNER, | § § | |
| | § | |
| Defendants Below, Appellees/Cross-Appellant. | § § | |

Submitted: January 28, 2026
Decided: April 20, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.

Andrew S. Dupre, Esquire (*argued*), Brian R. Lemon, Esquire, Alberto E. Chávez, Esquire, AKERMAN LLP, Wilmington, Delaware *for Plaintiff-Below/Appellant and Cross-Appellee, F.A.M.E. LLC.*

S. Mark Hurd, Esquire (*argued*), Alexandra M. Cumings, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; James D. Curphey, Esquire, Kyle C. Gilliam, Esquire, PORTER WRIGHT MORRIS & ARTHUR LLP, Columbus, Ohio *for Defendants-Below/Appellees and Cross-Appellants EmTurn LLC and Evan Turner.*

**SEITZ**, Chief Justice:

A professional basketball player's agent secured a lucrative endorsement contract for the player with a sportswear and sports equipment company. Part of the player's compensation was paid in company stock. Five years after the player terminated the agent, the player sold some of the stock. The agent sought a commission on the stock based on its value when sold. After the player refused to pay, the parties took their dispute to the Superior Court.

Following cross-motions for summary judgment, the court granted the player's motion. It held that the stock was commissionable, but the commission was due when the stock vested at various dates from 2011-2016 and not when the stock was sold. Suit was not filed until 2022, outside the three-year statute of limitations.

On appeal, the agent argues that the court erred by granting the player's summary judgment motion because there was a genuine issue of material fact about when the commission was due and therefore whether the statute of limitations barred the claims. The player cross-appeals the court's ruling that the stock was commissionable. For the reasons explained below, we agree with the Superior Court that the stock was commissionable but reverse its statute of limitations ruling because genuine issues of material fact existed about when the commission was due.

2

## I.

## A.

Evan Turner was a professional basketball player who started his career with the Philadelphia 76ers. Early in his career, Turner shook hands with David Falk, a prominent sports agent, on an agency agreement. They agreed that Falk's agency, FAME, would represent Turner and receive a commission-based marketing fee based on leads generated by FAME.[1]

FAME negotiated, and Turner's company, EmTurn, LLC, signed an August 23, 2010 endorsement agreement with Chinese sportswear and sports equipment companies Li-Ning Sports Technology Development (HK) Co. Limited and Li-Ning Sports USA ("Li-Ning"). In exchange for Turner's promotional activities, Li-Ning agreed to compensate EmTurn in four ways: (i) guaranteed minimum cash compensation; (ii) cash royalties based on Turner's signature product line; (iii) cash bonuses based on Turner's on court accomplishments; and (iv) one million shares of Li-Ning restricted stock.[2] The Li-Ning stock vested over time starting in 2011 and ending in 2016.[3]

---

[1] App. to Appellant's Opening Br. A34 [hereinafter "A"__] (First Am. Compl. ¶¶ 19–20).

[2] A744–47 (Li-Ning Contract § 4).

[3] A764 (Li-Ning Contract Schedule C).

On August 31, 2010, EmTurn and FAME reduced their handshake deal to writing ("2010 Agreement").[4] The 2010 Agreement provided that FAME would receive a 15% marketing fee "on all marketing income from leads initially generated by FAME."[5] The marketing fee increased to 20% if marketing income exceeded $2 million in any year.[6] Although "marketing income" was not defined, the 2010 Agreement stated that "FAME shall receive its Marketing Fee, as defined in this paragraph, from any and all Marketing Contracts finalized by FAME during the Term of this Agreement, regardless of when [EmTurn] receives compensation for such contracts."[7] Neither party disputes that the Li-Ning endorsement agreement fell under the 2010 Agreement.

Over time, EmTurn paid FAME marketing fees on the minimum cash compensation, royalties, and bonuses when EmTurn received payment from Li-Ning. Typically, Turner's banker Stephen Vujevich would notify FAME that EmTurn had received compensation from Li-Ning. FAME would then invoice EmTurn for its marketing fee. Although FAME was aware of the Li-Ning stock's vesting schedule, it never invoiced EmTurn for a marketing fee. Falk testified that

---

[4] A773–74 (2010 Agreement).

[5] A773 (2010 Agreement).

[6] *Id.*

[7] *Id.*

when it came to the stock compensation, he did not require EmTurn to pay a cash commission until Turner realized a liquidation event.[8]  In other words, when EmTurn received cash for the Li-Ning stock, FAME would invoice and was due a commission.

In May 2016, before Turner sold any Li-Ning stock, Turner ended his contract with FAME.[9]  Between August 2021 and October 2023, Turner sold 839,600 shares of Li-Ning stock with a total value of $7,222,863.30.[10]  FAME claimed that it first learned of these sales in early 2022.[11]  In July of that year, FAME invoiced Turner for a marketing fee on the Li-Ning stock sales.[12]  When Turner refused to pay, FAME filed this action on December 1, 2022.

B.

In its Superior Court complaint, FAME alleged breach of contract and other claims against EmTurn and Turner for failing to pay the marketing fee on the Li-Ning stock sales.  For ease of reference, we will refer to Turner and his company as EmTurn.  EmTurn denied the breach and raised other defenses, including a statute

---

[8] *See* A232 (Dep. of David Falk at 79:1–22).

[9] *See* A705–06 (May 25, 2016 Email From David Falk to Evan Turner).

[10] A79 (Defs.' Fourth Am. Objections and Answers to Pl's. First Set of Interrogatories at 29).

[11] A275 (Dep. of David Falk at 250:7–13).

[12] *See* A776 (FAME EmTurn Acct. Ledger).

5

of limitations defense. After discovery, the Superior Court granted EmTurn's motion for summary judgment, dismissing FAME's case in its entirety.[13]

First, the court found that, under the 2010 Agreement, the Li-Ning stock qualified as "marketing income" "such that it [fell] within Turner's obligation to pay FAME a Marketing Fee."[14] According to the court, EmTurn was obligated to compensate FAME "on all marketing income . . . from any and all Marketing Contracts."[15] The court relied on the fact that "Delaware courts have held '*all* means *all*' when interpreting a contract."[16] The Li-Ning endorsement agreement qualified as a marketing contract. Therefore, the Li-Ning stock paid to EmTurn for Turner's endorsements qualified as marketing income.

On the stock payment timing issue, the court decided that the 2010 Agreement was "silent," and thus, "ambiguous regarding when payment [was] due."[17] Looking to the parties' course of performance to resolve the ambiguity, the Superior Court found that the "Defendants paid commission on the Li-Ning Contract, when Li-Ning

---

[13] *F.A.M.E. LLC v. EmTurn LLC*, 2025 WL 1218227, at *1 (Del. Super. Apr. 25, 2025) [hereinafter Super. Ct. Op.].

[14] *Id.* at *4.

[15] *Id.* at *5 (quoting 2010 Agreement at 1).

[16] *Id.* at *5 (quoting *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1233 (Del. 2018)).

[17] *Id.* at *7.

6

compensated Turner."[18]  According to the court, because there was "no evidence FAME ever objected to this arrangement" and "there [was] no dispute that Defendants received the Stock at vesting," the court concluded that the claim "arose when the Stock vested."[19]

Further, relying on dictionary definitions, the court found FAME's position – that the marketing fee became payable when EmTurn sold the Li-Ning stock – inconsistent with the 2010 Agreement:

> Income is generally defined as money that is earned from doing work. Marketing is defined as a job that involves encouraging people to buy a product or services. Upon vesting, Turner received the Stock as payment for his efforts encouraging people to buy Li-Ning shoes. At that point, the Stock was marketing income and FAME could invoice a Marketing Fee.  Conversely, the money Turner received from the Stock sale was not due to any marketing efforts.[20]

The last of the Li-Ning stock vested on July 1, 2016.  A three-year statute of limitations applied.  Because the complaint was not filed until December 1, 2022, the Superior Court dismissed FAME's claims as time barred.

## II.

On appeal, EmTurn argues that the Superior Court erred by concluding that the 2010 Agreement unambiguously provided that the Li-Ning stock was

---

[18] *Id.*

[19] *Id.*

[20] *Id.* (cleaned up).

commissionable.  According to EmTurn, the 2010 Agreement did not address how to treat stock compensation.  Therefore, it argues, the court should have applied *contra proferentem*, meaning it should have interpreted the agreement against FAME, the party who drafted it, and dismissed the complaint.

FAME argues that the Superior Court erred in granting EmTurn's summary judgment motion because a factual dispute existed about the parties' course of performance with respect to when payment was due for stock compensation.  FAME points out that EmTurn did not offer course of performance evidence specific to stock compensation.  Moreover, FAME contends that the course of performance evidence relied on by the court was subject to more than one reasonable interpretation.  Thus, it argues, the court could have also concluded that the marketing fee was due when EmTurn sold the Li-Ning stock, not when the stock vested.  Therefore, the statute of limitations did not bar recovery.

On appeal, "[w]e review the Superior Court's grant of summary judgment *de novo*.  We review questions of contract interpretation *de novo*."[21]  Under Superior Court Rule of Civil Procedure 56, summary judgment should only be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

---

[21] *Intel Corp. v. Am. Guarantee & Liab. Ins. Co.*, 51 A.3d 442, 446 (Del. 2012).

The Superior Court correctly concluded that "marketing income" in the 2010 Agreement unambiguously included the Li-Ning stock. Under the 2010 Agreement, the Li-Ning endorsement agreement was a "lead[] initially generated by FAME" that resulted in a "Marketing Contract[] finalized by FAME during the Term of this Agreement."[22] In addition to three other listed forms of cash compensation, Li-Ning agreed to pay EmTurn Li-Ning stock for Turner's endorsements.[23]

EmTurn argues that, even though the Li-Ning stock was one of four forms of compensation in the 2010 Agreement, the lack of payment mechanisms for stock compensation means it was not commissionable.[24] We have some difficulty understanding the argument. Under the 2010 Agreement, FAME received a percentage of all remuneration EmTurn received from leads FAME generated that led to an endorsement contract. The stock was one of four forms of compensation specified in the Li-Ning endorsement agreement.[25] The lack of payment

---

[22] A773 (2010 Agreement).

[23] A744–46 (Li-Ning Contract § 4).

[24] Answering Br. 29 (the "mechanisms" are those that "one would expect to see in agreement for fee on stock" and include how to value the stock, determine when the commission is owed, and determine the form the commission is to be paid). There were, of course, details missing with respect to the cash compensation EmTurn received from Li-Ning as well.

[25] EmTurn's reliance on *Merck & Co. v. Bayer AG* is off the mark. 2023 WL 2751590 (Del. Ch. Apr. 3, 2023), *aff'd*, 308 A.3d 1190 (Del. 2023) (TABLE). *Merck* addressed how to interpret a pharmaceutical industry purchase agreement. The Court of Chancery found that because liability for certain product liability claims remained with the seller, the seller's interpretation of the

mechanisms or due dates may require the court to imply omitted terms, but it does not call into question whether the Li-Ning stock was commissionable.

Further, the term "marketing income" is not ambiguous "simply because it is not defined."[26]  The Superior Court gave the words their plain meaning – any remuneration EmTurn received as compensation from endorsement agreements.[27]  EmTurn was paid Li-Ning stock to compensate it for Turner's endorsements.  And if there was any remaining doubt, we need only look to a dictionary definition of income – "[t]he money or *other form of payment* that one receives . . . from employment, business, investments, royalties, gifts, and the like."[28]  The Li-Ning stock was an "other form of payment" from Li-Ning for Turner's endorsements.

---

indemnification provision, which would have its liability essentially sunset after seven years, was an "absurd conclusion" given that there was "no mechanism" in the purchase agreement to transfer them to buyer. *Id*. at *9.  Here, interpreting marketing income to include the Li-Ning stock despite the lack of payment "mechanisms" neither conflicts with other provisions of the contract nor causes an "absurd" result.

[26] *Zurich Am. Ins. Co. v. Syngenta Crop Prot. LLC,* 314 A.3d 665, 676 (Del. 2024) ("A term is not ambiguous simply because it is not defined[.]" (quoting 1 Bradley W. Voss, *Voss on Delaware Contract Law* § 3.06 [2][j] at 3-35 (Jan. 2023))).

[27] Super. Ct. Op. at *5.  *See Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013) (the court should give contract terms their "plain meaning unless it appears that the parties intended a special meaning").

[28] *Income*, Black's Law Dictionary (12th ed. 2024) (emphasis added).  *See Lorillard Tobacco Co. v. Am. Legacy Fdn.*, 903 A.2d 728, 740 (Del. 2006) ("When a term's definition is not altered or has 'no 'gloss' in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning.'" (alteration in original) (quoting *USA Cable v. World Wrestling Fed'n Entm't, Inc.*, 766 A.2d 462, 474 (Del. 2000))).

B.

Having found the Li-Ning stock commissionable, the next issue is whether FAME's breach of contract claim against EmTurn is barred by the statute of limitations. Typically, a three-year statute of limitations applies to breach of contract claims.[29] The statute begins to run when the contract is breached, meaning when payment is due.[30]

Although the parties framed the contractual dispute as a search for the meaning of an ambiguous term, they failed to distinguish between contractual silence, when the contract does not address the issue, and ambiguity, when contract language is susceptible of different reasonable interpretations.[31] The 2010 Agreement had a missing term – when were commission payments due?[32] Where,

---

[29] 10 *Del. C.* § 8106.

[30] *Chertok v. Zillow, Inc.*, 2021 WL 4851816, at *6–7 (Del. Ch. Oct. 18, 2021) (dismissing breach of contract claims alleging failure to make pre-closing dividend payments as time-barred because complaint was filed more than three years after plaintiffs' "entitlement to the dividend payments arose"), *aff'd*, 277 A.3d 1258 (Del. 2022) (TABLE).

[31] We do not fault the Superior Court for following the lead of the parties and undertaking an ambiguity analysis.

[32] *See Murr v. Midland Nat. Life Ins. Co.*, 758 F.3d 1016, 1020 n.4 (8th Cir. 2014) ("[w]hen a term is missing, however, there is nothing to interpret or to find ambiguous"); *Nissho Iwai Europe PLC v. Korea First Bank*, 782 N.E.2d 55, 60 (N.Y. 2002) ("[A]s with all written agreements . . . ambiguity does not arise from silence, but from 'what was written so blindly and imperfectly that its meaning is doubtful.'" (quotation omitted)); Restatement (Second) of Contracts § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *see also AR Cap., LLC v. Xl Specialty Ins. Co.*,

11

as here, the contract does not provide the time for payment, "the court will imply a reasonable time."[33]  Ordinarily, questions like what is a reasonable time for payment cannot be resolved on summary judgment because the factfinder must assess "prior dealings of the parties, the practice in the relevant community and trade or business and other circumstances surrounding the execution and performance of the contract."[34]  As explained next, that is the case here.

### 1.

The parties agree, and their course of performance confirms, that commissions on cash compensation were paid when EmTurn received payment.  According to the parties, for stock compensation, there were two possibilities when a commission

---

2018 WL 6601184, at *6 (Del. Super. Dec. 12, 2018) (observing that "provisions not included in an agreement are not equivalent to ambiguous terms").

[33] *Martin v. Star Pub. Co.*, 126 A.2d 238, 244 (Del. 1956); *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *11 n.96 (Del. Ch. May 2, 2007) ("When time is not of the essence, the UCC and the common law of contracts both require performance within a reasonable time."); *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1034–35 (Del. Ch. 2008) (where stockholders were entitled to earnout payment under a merger agreement, but the agreement lacked "a provision requiring payment on a specific date," there is an implied "duty to make payment on that obligation within a reasonable time"); *Alonso v. Maldonado*, 2015 WL 7068206, at *2 (Del. Super. Nov. 12, 2015) (inferring a reasonable time for repayment on loan agreement which did not include payment date term and holding that the statute of limitations did not bar recovery where suit was filed within three years of that time).  EmTurn acknowledges in its appellate briefing that: "[u]nder Delaware law, '[w]here a contract is silent on the time given to a party to perform a condition, then this Court will assume that the parties contemplated a reasonable time.'"  Answering Br. 24 (first alteration added) (quoting *White v. Russell*, 2023 WL 3191746, at *6 (Del. Ch. May 2, 2023)).

[34] *Dechant v. Williams*, 1990 WL 1104786, at *2 (Del. Ch. 1990) (denying summary judgment when contract required performance within "a reasonable time"); *see also HIFN, Inc.*, 2007 WL 1309376, at *11 (observing that what constitutes "a reasonable time is ordinarily a question of fact and thus often inappropriate for resolution at the summary judgment stage").

payment was due – when the shares vested, and when EmTurn sold the Li-Ning stock. The summary judgment record supports EmTurn's view that a commission was owed when the Li-Ning stock vested. As EmTurn argued, if there is no deadline for payment of a fee on stock, then EmTurn could hold the Li-Ning stock forever. And it points to treasury regulations addressing when capital gains or losses are recognized, and the fact that EmTurn paid taxes when the stock vested. Thus, EmTurn argues, it makes sense that a commission payment was due when the Li-Ning stock vested.

But viewing the summary judgment record in a light most favorable to FAME, the summary judgment record and course of performance evidence supports another conclusion – a reasonable time for the commission payment was when EmTurn received cash from the sale of stock to pay the commission. The parties did not address the payment timing issue at or before the time of contracting. After signing the 2010 Agreement, FAME never invoiced EmTurn for a commission on the Li-Ning stock until EmTurn had cash to pay the commission. In June 2016, FAME emailed EmTurn's accountant stating that EmTurn was about to receive the last of its Li-Ning stock and that the parties needed "to determine when [Turner] will sell these shares and pay FAME its 20% fee of their value."[35] And, as the Superior

---

[35] A802 (June 16, 2016 Email From FAME to Stephen Vujevich). The Superior Court also relied on deposition testimony by EmTurn's accountant, Stephen Vujevich. *See* Super. Ct. Op. at *7 n.107. Vujevich's testimony, however, was inconclusive. He testified that EmTurn had not

13

Court observed, "FAME always invoiced its Marketing Fees when [EmTurn] actually received *cash compensation*."[36]

Further, looking at business custom and usage in the sports agency industry, Falk testified that taking a cash commission at the time of vesting would be "one of the dumbest things possible for an agent to do."[37] He explained:

> My job is to build trust with my clients. I take every step I can to build trust to let them know that I'm not going to put my own personal interest ahead of their interest. And so it would be almost suicidal for an agent to bill a player when the stock vest[s], in the event it goes down, you are going to get fired because it looks like you are putting your own interest ahead of the player's, you [are] trying to get the fee early.[38]

We conclude that genuine issues of material fact existed about a reasonable time for paying FAME a commission on the Li-Ning stock. The statute of limitations accrual date depends on resolving the payment date. Thus, summary judgment should not have been granted to EmTurn.

---

historically disputed FAME's invoices, which he received after EmTurn was paid "actual money" from Li-Ning. A548, A556 (Dep. of Stephen Vujevich at 49:9–14, 78:17–20).

[36] Super. Ct. Op. at *6 (emphasis added).

[37] A232 (Dep. of David Falk at 79:9–10).

[38] A232 (Dep. of David Falk at 80:12–21).

2.

EmTurn argues that the Superior Court held, on an alternative basis, that FAME's position was inconsistent with the 2010 Agreement. According to EmTurn, the court reasoned that the Li-Ning stock was payment for Turner's marketing efforts; when EmTurn received the vested shares, FAME could invoice for the marketing fee; and after that, the money EmTurn received from selling its Li-Ning stock came from non-marketing capital gains/losses and not from any marketing efforts.

If we accepted EmTurn's view of the Superior Court's ruling, it would be inconsistent with the court's earlier finding that the 2010 Agreement was "ambiguous" – meaning more than one reasonable interpretation existed about when the commission was due. In any event, as we have reframed the dispute, the 2010 Agreement did not address when payment was due. The 2010 Agreement could not, therefore, control as a matter of law when a commission payment was due on the Li-Ning stock.

III.

The judgment of the Superior Court is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion. On remand, the fact finder should decide what was a reasonable time to pay the

commission on the Li-Ning stock – at the time of vesting, or at the time of sale. The answer will dictate the outcome of the statute of limitations issue.